# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-00786-SCT

*KENDALL BLAKE, M.D. AND JACKSON BONE
AND JOINT CLINIC, L.L.P.*

*v.*

*DAVID ALEXANDER CLEIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/19/2002 |
| TRIAL JUDGE: | HON. TOMIE T. GREEN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | STUART ROBINSON, JR. |
| | RICHARD T. CONRAD |
| | LEO JOSEPH CARMODY |
| | PAMELA SUE RATLIFF |
| ATTORNEYS FOR APPELLEE: | LANCE L. STEVENS |
| | RODERICK D. WARD, III |
| | MICHAEL D. GREER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | REVERSED AND REMANDED - 04/07/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

EN BANC.

RANDOLPH, JUSTICE, FOR THE COURT:

¶1.     This medical malpractice action was filed in the Circuit Court of the First Judicial District of Hinds County by David Alexander Clein, and his wife, Deborah Clein ("Clein"), against Dr. Kendall Blake ("Dr. Blake") and the Jackson Bone and Joint Clinic, L.L.P. (JBJC). Deborah subsequently dismissed her suit for loss of consortium with prejudice. Following conclusion of the trial, the jury returned a verdict in favor of Clein and jointly against the

defendants for $3,500,000. Dr. Blake and JBJC filed a motion for judgment notwithstanding the verdict, or in the alternative, for new trial or remittitur, which the circuit court denied.

¶2.     Dr. Blake and JBJC appeal and raise the following issues of error:

I.      **The trial court erred in refusing defendants' jury instructions D-12 and D-20, addressing the applicable Mississippi law regarding the issue of informed consent.**

II.     **The trial court erred in precluding all efforts to have the jury consider the testimony and/or account of witnesses, Ann Maddox and Elaine Puckett.**

III.    **The trial court erred in precluding the defense from examining witnesses, or otherwise referencing, plaintiff's belief that a "curse" had been placed upon him by his deceased mother, an alleged practicing witch.**

IV.     **The trial court erred in failing to exclude the testimony of Dr. Hans-Jorg Trnka, a physician neither licensed to practice medicine in the United States nor otherwise qualified to testify as to the requisite standard of care.**

V.      **The trial court erred in allowing gruesome, gory photographs of plaintiff's fresh, bloody amputated limb, taken in the surgical suite, into evidence.**

VI.     **The trial court erred in precluding the admission, or demonstrative use, of exhibits D-20, D-21, and D-24, substituted for those found missing after trial.**

VII.    **The trial court erred in instructing the jury, sua sponte, on the issue of aggravation of plaintiff's pre-existing mental condition.**

VIII.   **The trial court erred in refusing defendants' jury instruction D-19, regarding the non-taxability of compensatory damages.**

IX.     **The trial court erred in prohibiting the jury from considering the fact that plaintiff submitted false sworn discovery responses.**

X.      **The trial court erred in failing to preserve exhibit P-18, in that a page thereof was found to be missing after trial, such that**

2

**appellants are precluded from presenting their objection to such on appeal.**

**XI.   The trial court erred in denying defendants' motion for directed verdict, subsequent renewal thereof, and motion for judgment notwithstanding the verdict based upon the fact that none of plaintiff's experts testified to the requisite degree of medical probability that plaintiff's amputation and other alleged damages were proximately caused by the surgery performed by Dr. Blake.**

**XII.  The court should, alternatively, order a remittitur as the verdict evinces bias, passion, and prejudice on the part of the jury, and is contrary to the overwhelming weight of the evidence.**

### FACTS

¶3.    In 1981 (at the age of 18) Clein was seriously injured in a motorcycle accident which resulted in fractures of his left tibia, fibula, femur; several metatarsals in his left foot; and, the amputation of the left fourth toe.   He also suffered multiple lacerations on the top of his left foot and a ten-inch laceration on the sole of his left foot, in addition to a multitude of other injuries.   Clein remained in the hospital for 51 days following his motorcycle accident. Subsequently, he endured 22 operations, in addition to other treatments, medications and modalities.   Clein's history of pain and discomfort to his lower left leg and foot followed for a number of years, albeit with extended periods where no medical treatment was sought, prior to his seeing Dr. Blake.

¶4.    In August of 1982, Clein saw Dr. Harold Alexander for thick calluses on the plantar aspect of the fourth and fifth metatarsal head areas of the left foot.   To relieve the pressure causing the calluses, Clein had an osteotomy of the fourth metatarsal, left foot.   His last operation during this time frame was in 1984, where he had surgery for an overlapping fifth toe, left foot.   After these operations Clein finished high school, attended college,   was able

3

to run a few miles a day, worked several jobs, including a job as a bartender and bar manager which required him to constantly remain on his feet.

¶5.   In 1988, Clein sought psychiatric treatment after the death of his mother.   His hospital stay was three weeks, and he was treated for depression.   He was also having pain over the left second and fourth metatarsal heads, left foot, at that time, now seven years post accident.   Dr. Alexander's notes reflect that Clein was drinking a couple of beers a day to relieve pain from the motorcycle injury.   It also hurt Clein to walk sometimes.   Medical records reflect that he had had multiple problems with the left foot following the motorcycle accident.

¶6.   In December of 1991, Clein developed calluses underneath the left second and fourth metatarsal heads and an infection on the bottom of his left foot that resulted in swelling. Following this infection, in January of 1992, Clein requested and obtained pain medications from Dr. James Hughes in Jackson.   In February of 1992, Dr. Hughes refused to authorize refills due to the frequent requests by Clein.   In October of 1992, Dr. Hughes assisted Clein in obtaining a parking permit from his employer due to his physical infirmities.   In November of 1992, Clein who was still having problems from the infection in his foot, saw Dr. Hughes, who instructed Clein to continue non weight bearing as much as possible.   Dr. Hughes prescribed crutches, but Clein was noncompliant and elected not to follow Dr. Hughes's advice.   Clein continued to seek treatment to relieve pain and was fitted for shoe inserts. During this time Clein was also again seeing a psychiatrist.   Dr. Hughes continued to see Clein for problems with his foot during 1993 and also noted that Clein had obtained orthotic shoes which were used with inserts to alleviate his pain.

¶7.    In January of 1995, Clein again saw Dr. Hughes with complaints caused by a new orthotic shoe for the left foot and to renew a Jobst stocking prescription.  Clein complained of pain and discomfort when he failed to wear his specially orthotic designed shoe.  Clein was given Lortab 10, a narcotic pain medication, with the admonition that Dr. Hughes would not give him any more pain medications, as Dr. Hughes advised Clein that he could not treat chronic pain problems with medications.  Dr. Hughes opined that, for the most part, Clein suffered pain from January of 1992 through 1995.

¶8.    In the summer of 1995, Clein and his family were preparing for a trip to Six Flags in Atlanta, Georgia.  According to Clein, he wanted pain medication for the trip in anticipation of the pain he knew he would experience from walking around Six Flags in nonorthotic shoes for long periods.  Clein visited Six Flags in 1994 and wore tennis shoes, rather than the orthotic shoes fitted with an insert which had been prescribed for him.  Clein knew Dr. Hughes would not prescribe pain medication.  Therefore, Clein sought out a physician to obtain pain medication for use on the trip.

¶9.    In August of 1995, Clein testified that he was working as a purchasing agent at the University Medical Center which also required him to be on his feet.  He continued to suffer pain when walking, although it was not constant.

¶10.    Clein first sought the services of Dr. Blake for the purpose of obtaining medications to alleviate pain in his left lower extremity, primarily his left foot, as his primary treating physician, Dr. Hughes, refused to prescribe additional medications.  Clein's first office visit to JBJC and Dr. Blake was on August 2, 1995.

5

¶11.    Dr. Blake noted that Clein experienced general discomfort.    Dr. Blake performed a physical examination and obtained an x-ray.    To alleviate Clein's chronic pain, Dr. Blake recommended a multiple metatarsal osteotomy without fixation as an outpatient procedure. Dr. Blake informed Clein that he would be performing an osteotomy of two or more metatarsals in the left foot.    According to Clein, and not included in Dr. Blake's notes, the doctor failed to inform Clein of the surgery's high failure rate, risks of mal-union and non-union, among other things; and, that Blake had never performed a multiple metatarsal osteotomy where the second through the fifth metatarsals would be broken in the procedure at the same time.    Dr. Blake testified that he had performed multiple osteomies, but never performed the second through the fifth in one operation.    Clein elected to undergo the surgery which took place on August 18, 1995.

¶12.    After the surgery Clein experienced extreme pain.    He went to the emergency room soon after the surgery because of pain.    Clein's foot was loosely wrapped in bandage and tape, and when the foot began to swell, this started to cut off the circulation in his foot.    Clein was instructed to put weight on his foot following the surgery, but testified that he could not do this because of excruciating pain that would run through his entire leg.    After seeing Dr. Blake for four follow-up visits, he was not satisfied with the way his foot was healing and returned to Dr. Hughes for a second opinion.    Dr. Hughes placed him in a cast. During this time, Clein first wore a cast, then a walking boot, and used crutches.    After the cast came off, there was unusual seepage from his foot, and he was still experiencing excrutiating pain.    Clein was told to try to walk on the foot, and said he tried to do this, but it was still very painful.

¶13.   Clein continued to have pain and saw Dr. Keith C. Donatto, an orthopaedic surgeon, with the LSU Medical Center in New Orleans on July 21,1997. Clein only saw Dr. Donatto on this one occasion. He first sought treatment from Dr. Frank Gottschalk, an orthopaedic surgeon in Texas at the Zale Lipshy University Hospital, on August 11, 1997, for back pain which Clein thought might be related to his difficulties with walking.  Dr. Gottschalk advised that if the foot was so painful that Clein could not bear the pain, then he should consider amputation. Dr. Gottschalk also recommended that Clein see a psychiatrist. This suit was filed on August 29, 1997. Clein proceeded with an amputation of his left foot at the ankle joint on November 6, 1997.

¶14.   At trial Clein testified that after the amputation he had an emotional breakdown and became depressed. He was admitted to a hospital for clinical depression several times. He could not work for approximately two and a half years following the amputation. Clein testified that he used a prosthetic leg which routinely  requires maintenance. He also testified how his daily life changed while using the prosthetic. Clein gained 80 pounds subsequent to the surgery. He testified that losing a limb was a "most traumatic experience." Clein incurred $212,477.81 in medical expenses and lost $116,923.20 in wages. Nathaniel Fentress, a rehabilitation counselor, testified that Clein would have future medical expenses in the amount of $597,446.60 and$115,200 in future wage loss.[1]

¶15.   After Clein filed suit, Mrs. Ann Maddox (Clein's mother-in-law), called JBJC to discuss the lawsuit with Dr. Blake. She was not able to talk to Dr. Blake, but talked with Elaine

---

[1]Although not raised on appeal, and not objected to at trial, this Court cautions against the use of a rehabilitation counselor to determine the present net value of future medical expenses and future wage loss, an area usually reserved for economists.

7

Puckett, a nurse at the Clinic. The details of their conversation are at issue. In Maddox's written deposition, which was excluded by the trial court and not read into evidence, Maddox claims that she was calling to see what care Clein should give his leg and whether or not Clein should be walking on it or not. However, Puckett prepared a memorandum record of her version of the August 7, 1998, phone call, wherein she wrote that Maddox called because Maddox did not feel like the lawsuit should be taking place, and Clein should not blame Dr. Blake for problems that he had not caused. Puckett further wrote that Maddox said that Clein was "not taking care of his leg, and did not before this . . . he never took care of his leg." Finally Maddox stated, "he is seeing a psychiatrist and they are saying this is because he is upset because of what happened to his leg but he was having problems before all this and seeing a psychiatrist."

## ANALYSIS

¶16. This Court has repeatedly held that while litigants are not entitled to a perfect trial, they are entitled to a fair trial. *Ekornes-Duncan v. Rankin Med. Ctr.*, 808 So. 2d 955, 959 (Miss. 2002). *See also Parmes v. Ill. Cent. Gulf R.R.*, 440 So. 2d 261, 268 (Miss. 1983). This trial was neither perfect, nor fair. Multiple errors occurred at the trial level, including the exclusion of relevant witnesses and evidence. While the individual errors may not have been reversible in themselves, they may combine with other errors to make reversible error. *Estate of Hunter v. Gen. Motors Corp*. 729 So. 2d 1264, 1279 (Miss. 1999). *See also Ill. Cent. R.R. v. Clinton*, 727 So. 2d 731 (Miss. Ct. App. 1998). This Court finds that the cumulative effect of the errors is sufficient to warrant reversal and remand for a new trial.

8

### I. Did the trial court err in refusing defendants' jury instructions, D-12 and D-20?

¶17. The standard of review for jury instructions is as follows:

[T]he instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse the instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case.

*Thomas v. State*, 818 So. 2d 335, 349 (Miss. 2002). *See also **Haggerty v. Foster***, 838 So.2d 948, 953 (Miss. 2002).

¶18. Dr. Blake and JBJC argue that it was error to refuse the defendants' jury instructions Nos. D-12 and D-20.

D-12 provided:

The court instructs the jury that to recover in this case for lack of informed consent, the plaintiff must prove a causal connection between information allegedly not provided by Dr. Blake and the injuries to the plaintiff, if any. The existence of a causal connection is determined by whether a reasonably prudent patient, fully advised of the material known risks, would have consented to a multiple metatarsal osteotomy.

Therefore, even should you find by a preponderance of the evidence that Dr. Blake failed to disclose materially known risks about the procedure to Mr. Clein, you should nevertheless return a verdict in favor of Dr. Blake and Jackson Bone and Joint Clinic as to the informed consent claim, if you find that a reasonably prudent patient in Mr. Clein's situation would have consented to a multiple metatarsal osteotomy after being fully advised of the material known risks of that surgery.

D-20 provided:

The Court instructs the jury that in order to recover in this case, the plaintiff must prove by a preponderance of the evidence that Dr. Blake's surgery was the proximate cause of his alleged worsened condition and damages, if any. That is, the plaintiff must prove by a preponderance of the evidence that the complaints he allegedly had which allegedly necessitated an amputation were the result of

Dr. Blake's surgery and not simply a continuation of his original motorcycle injury, or some other illness or condition.

Therefore, even should you find by a preponderance of the evidence that Dr. Blake failed to disclose all of the known material risks of the surgery to Mr. Clein and/or was negligent in performing that surgery, you should nevertheless return a verdict in favor of Dr. Blake and the Jackson Bone and Joint Clinic if you find that plaintiff has failed to show that the complaints he allegedly had which allegedly necessitated an amputation were the result of Dr. Blake's surgery and not simply a continuation of his original motorcyle injury or the product of some other condition.

¶19. This Court finds that D-12 and D-20 should have been submitted to the jury. Each presented separate theories of the defendants' case, were not repetitive, correctly stated the law, and had a proper foundation based on the evidence presented. The trial judge eviscerated the defense of Dr. Blake and JBJC by denying the defendants' theory instructions, D-12 and D-20, which compromised the defendants' right to a fair and impartial trial.

## II. Did the trial court err in precluding the testimony or account of witness Ann Maddox?

¶20. Ann Maddox is Clein's mother-in-law. On August 7, 1998, Maddox called Dr. Blake, approximately one year after the law suit had been filed. Dr. Blake's nurse prepared a written record of the conversation. Later, Maddox voluntarily visited Dr. Blake's attorney's offices. Subsequently, the Defendants sought to depose Ann Maddox regarding her knowledge of relevant evidence. On June 16, 1999, the parties appeared at Ann Maddox's home to take her deposition. According to Dr. Blake, before the deposition was commenced, Maddox produced two letters from physicians, one which stated that she could participate in a deposition in her home, and one that stated that she could not due to her emotional state. Defendants assert that Maddox appeared calm at her home before she was confronted by Clein and her daughter,

10

Clein's wife, then also a plaintiff. Plaintiffs objected to the deposition, and a telephonic hearing was held, wherein the court ordered suspension of the deposition until a hearing could be held before the court.

¶21. The hearing was held on July 9, 1999, regarding the resumption of the deposition. The court reviewed conflicting opinions from Dr. Troy Caldwell. In a letter dated February 19, 1999, Dr. Caldwell opined that Maddox's "ability to travel is limited. A deposition should be held at her home." Subsequently, on May 20, 1999, less than a month before the deposition was to take place, Dr. Caldwell issued a second letter opining that the "stress of a deposition may cause worsening of her already unstable state. Much regression could be potentially lethal for this already depressed lady. In the strongest way possible, I advise to not pursue this deposition." The trial judge also referred to a letter by Dr. William G. Munn, dated February 5, 1999, which opined the following:

> This lady has a long standing diagnosis of multiple sclerosis. She suffers from chronic anxiety and depression. She takes multiple medications including Klonopin, Prozax, and Thorazine. She should not be placed in stressful situations due to the danger of having an exacerbation of her MS. She should not be subjected to the stress of testifying in court in my opinion.

The court denied the defendants' Motion to Resume Deposition and ruled that the defendants could not conduct an oral deposition. However she instructed the defendants to submit written questions as provided in M.R.C.P. 31 to Maddox and that the court would determine at a later date what to do about her testimony. The written deposition was taken on, July 19, 2000, without counsel present.

¶22. The trial began over one and a half years later, on February 11, 2002. The defense subpoenaed Ann Maddox for trial. At trial the defendants' counsel advised the court that the

11

defendants had subpoenaed Maddox and that they had received a fax purportedly from Maddox containing a letter from Dr. Munn opining that Maddox *would be unable to serve on a jury because of her health.*

¶23. The trial judge, on her own initiative, and without a motion to quash the subpoena pending, called Dr. Munn and conducted an ex parte discussion about his opinion. In this discussion, the judge determined that Dr. Munn had neither seen Maddox or physically examined her for more than a year. The judge asked if Maddox was mobile, to which Dr. Munn replied in the affirmative. Dr. Munn privately opined to the judge that she could give testimony for thirty minutes. He further opined that "it would aggravate her multiple sclerosis and other problems that would do more damage to her if she were to take the stand as opposed to her not taking the stand." According to the judge, the doctor also opined that he did not think that Maddox was emotionally stable enough to take the stand. The court then sua sponte released Maddox from honoring the subpoena and ruled that the written deposition could be introduced into evidence subject to her review. Clein was asked if he had any objections to the deposition being read into evidence, to which he did not. However, objections were reserved to some of the questions and answers.

¶24. Later during the trial, the court reviewed Maddox's written deposition. The court noted that at the beginning of the deposition, Maddox stated that she was under the influence of drugs and that she could not be accurate. However, a complete reading of the deposition belies this assertion and the witness's responses to some questions appear quite lucid, albeit other responses evidence evasiveness. The basis of the evasiveness is supported by Puckett's notes of the telephone call to Dr. Blake's office wherein Maddox expressed a desire for

12

confidentiality for more than one reason, including the relationship with the Clein's children. Additionally, defendants assert that during the attempted taking of the oral deposition on June 16, 1999, Maddox was confronted by both her daughter and son-in-law. Unfortunately, the judge failed to require the physical presence of Maddox in order to make a judicial determination on the record under the Mississippi Rules of Civil Procedure as to the witness's competency, or require testimony of any physicians to make a judicial determination on the record of the validity of Maddox's alleged unavailability.

¶25.   To compound these errors, the judge incorrectly excluded Maddox's Rule 31 deposition in its entirety, from being heard by the jury.

¶26.   Therefore, the jury was precluded from hearing any testimony, by deposition or otherwise, of Ann Maddox. This was clearly erroneous. Under Mississippi law, "if the evidence has any probative value at all, the rule favors its admission." Miss. R. Evid. 401, cmt. *See also* **Holladay v. Holladay** 776 So. 2d 662, 676 (Miss. 2000). "[T]he threshold for admissibility of relevant evidence is not great. Evidence is relevant if it has any tendency to prove a consequential fact." **Whitten v. Cox**, 799 So.2d 1, 15 (Miss. 2000). "Any witness is competent to testify who has evidentiary facts within his personal knowledge, gained through any of his senses." **Dennis v. Prisock**, 221 So. 2d 706, 710 (Miss. 1969). Portions of Maddox's testimony should have been admitted as it was clearly relevant and had probative value.

### A. Ordering the Written Deposition

¶27.   It was error for the judge to order a written deposition based solely on conflicting doctor's notes or letters, especially when they only raise *potential* health problems, not

13

probable. A written deposition is certainly not as effective as an oral deposition, and the defendants should not have been denied an oral deposition solely based on conflicting and otherwise inadmissible evidence. "[I]t has long been recognized that there are far greater advantages in obtaining the facts and circumstances involved in a confronting examination than in a written one." *Goldberg v. Raleigh Manufacturers, Inc.*, 28 F. Supp. 975, 976-77 (D. Mass. 1939). Furthermore, "an oral deposition has the advantage of allowing cross examination of an evasive, recalcitrant, or hostile witness." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice & Procedure Civil 2d § 2039 at 512-13 (1994) (footnote omitted). *See also Alliance to End Repression v. Rochford*, 75 F.R.D. 428 (N.D. Ill. 1976). The court should have held an evidentiary hearing regarding Maddox's condition, with the doctors testifying under oath, under cross-examination regarding their opinions and the basis of same. The letters were insufficient, by themselves, to disallow an oral deposition. Furthermore, the letters which would be inadmissible in a hearing, were insufficient in fact.

### B. Releasing Maddox from her Subpoena

¶28. The testimony of witnesses shall be taken orally and in open court. M.R.C.P. 43. Other rules provide when depositions may be used in lieu thereof, subject to certain qualifications. M.R.C.P. 32. Of course in certain circumstances, the court does have the authority to quash a subpoena, but it was error for the judge to do so in the manner that occurred. According to M.R.C.P. 45, *on timely motion*, the court can quash a subpoena if it subjects a person to undue burden. However, neither party filed a motion to quash. The judge based her decision on a fax from Dr. Munn and an ex parte conversation, without notice to either party, without the benefit of observing witnesses, without the defendants having the right to confront the witness or the

14

doctors advocating her unavailability as a witness. The judge erred when she called the doctor on her own initiative, without informing either party of her intentions to do so, and without allowing either party to explore the basis of the doctor's opinion. "A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding . . . ." Miss. Code of Jud. Conduct Canon 3B(7). A hearing should have been held giving each party the ability to obtain an accurate portrayal of Maddox's ability to testify vel non.

¶29. Furthermore, the judge's inexplicable reliance on a physician's assessment *who had not seen or physically examined the witness in over a year*, was clear error. There should have been an in-court inquiry as to the actual present status of Maddox's ability to testify, especially with Dr. Munn's opinion that Maddox was still "mobile" and "could give testimony for 30 minutes." The trial court erred in quashing Ann Maddox's subpoena.

### C.    Exclusion of Maddox's written deposition

¶30.    Mississippi Rule of Civil Procedure 32(a)(3)(C) provides that:

> The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment

The trial judge abused her discretion in excluding Maddox's written deposition in the entirety. "Admission or suppression of evidence is within the discretion of the trial judge and will not be reversed absent an abuse of that discretion." *Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God, Inc.*, 716 So. 2d 200, 210 (Miss. 1998) (citations omitted). The reviewing court may reverse a case only if, "the admission or exclusion of evidence . . . results in prejudice and harm or adversely affects a substantial right of a party." *K-Mart Corp. v.*

15

*Hardy*, 735 So.2d 975, 983 (Miss. 1999). It is self evident that a defendant loses a substantive right when he is prohibited from examining a close family member regarding his or her firsthand knowledge of plaintiff's physical and mental condition both before and after the alleged injury was incurred, as well as the plaintiff's post-surgical condition and activities, and any acts or statements contrary to those espoused in court.

¶31. Defendants allege that Maddox's testimony would raise compelling questions regarding the legitimacy of plaintiff's claims and specifically wanted to confirm Maddox's phone call to Dr. Blake and meeting with the Defendants' attorneys and to offer evidence to support their theory of the case. The trial judge excluded the deposition in its entirety based on Maddox's statement that she was under the influence of drugs and that she could not guarantee the truthfulness of her answers.

¶32. This Court has found that drug and alcohol abuse does not render a witness incompetent per se. *Carter v. State*, 743 So. 2d 985 (Miss. 1999). In Carter, this Court found that an eye witness who had drug and alcohol problems was competent to testify and recognized a general trend "to reject rigid rules of incompetence in favor of admitting the testimony and allowing the triers of fact judge the weight to be given such evidence." *Id.* at 989 (citing *United States v. Killian*, 524 F. 2d 1268, 1275 (5th Cir.1975) (trial court did not abuse discretion in allowing witness to testify despite contention that he was a heavy user of drugs and suffered time to time from hallucinations)). It was error for the trial court to exclude Maddox's deposition on the basis of drug use. Furthermore, other portions of the deposition clearly bear out the lucidity of the witness.

16

¶33. After improperly quashing Maddox's subpoena to testify live, the judge should have minimally allowed relevant testimony to be introduced into evidence. The fact that Maddox was taking medications alone cannot be the sole basis for exclusion. If that was the sole test, injured plaintiffs taking medication would never be allowed to testify. "[T]his court consistently holds that decisions as to the weight and credibility of a witness's statement are the proper province of the jury, not the judge." *Doe v. Stegall*, 757 So. 2d 201, 205 (Miss. 2000). The jury should have been allowed to reach their own conclusions about Maddox's testimony and whether or not it was reliable or credible. "If evidence has any probative value at all, the rule favors its admission." Miss. R. Evid. 401 cmt. Excerpts from the written deposition of Ann Maddox include the following:

> Q: What was the purpose for calling Dr. Blake's office?
>
> AM: I think it was something concerning -- about Alex walking on his foot.
>
> Q: What did you intend to discuss with Dr. Blake?
>
> AM: That.
>
> ***
>
> Q: And at the time you called Dr. Blake's office, a lawsuit had been filed by your daughter and son-in-law against Dr. Blake?
>
> AM: I believe it had. I don't know for sure whether it had been filed or not. I don't know the dates.
>
> Q: You attempted to call Dr. Blake, a man whom you had never met, about a lawsuit your daughter and son-in-law had filed?
>
> AM: Yes
>
> Q: Because you did not believe it was right for Dr. Blake to be blamed for Mr. Clein's problems?

17

A:     I'm no doctor. I don't know that.

Q:     You also told the person you spoke to at Dr. Blake's office that you did not want your name brought into this?

AM:    We just wanted some information, and we just preferred that it wouldn't be told, because we wanted it -- to know for ourselves.  That's what I can remember right now.

Q:     You felt that Dr. Blake needed to know what was going on insofar as the lawsuit your daughter and son-in-law filed against him?

AM:    I can't remember clearly now.  But to the best of my knowledge at this time, I believe we were going to ask him whether he should walk on his foot or not.

Q:     You told the person with whom you spoke that you thought that Dr. Blake needed to know what was going on?

AM:    I don't know whether it would have hurt if he walked on it or not.

Q:     Why did you feel Dr. Blake needed to know what was going on concerning the lawsuit?

AM:    I don't understand that.  At the present time, I don't understand.

Q:     You did not feel the lawsuit filed by your daughter and son-in-law was right?

AM:    Oh, I don't know.

Q:     In fact, you told the person with whom you spoke: "This lawsuit is just not right"?

AM:    I don't remember that at this time.  I don't remember.

Q:     And that was because you knew that Mr. Clein, your son in law, did not take care of his leg before the surgery performed by Dr. Blake?

AM:    I don't know the instructions that he gave him about taking care of it.

Q:     In other words, you believed Mr. Clein was blaming Dr. Blake for problems that existed before the surgery performed by Dr. Blake?

AM: I know he said he had an accident, but I thought that was the reason he went to the doctor, you know, because he needed treatment. I don't know. I can't think.

Q: Was your visit concerning the lawsuit your son-in-law and daughter filed against Dr. Blake?

AM: We were concerned about him walking on his foot, if it would hurt it or not. And I -- at this time I can't remember just what was said.

¶34. Maddox's testimony was relevant because Maddox raised issues regarding the legitimacy of plaintiff's claims, and she had firsthand information regarding plaintiff's physical and mental condition both before and after Dr. Blake's treatment. While Maddox did frequently answer questions by saying that she did not know, or that she was not sure, importantly she confirmed the phone call to Dr. Blake's office, which was documented by another excluded witness, Elaine Puckett. She confirmed that the phone call had something to do with Clein walking on his foot. She confirmed he needed treatment. This testimony should have come before the jury by way of Maddox's in-court testimony. However had a hearing been held regarding her ability to attend court due to illness or infirmity, and she was declared unavailable, then minimally, in the alternative, the judge should not have excluded the written deposition in its entirety.

### D. Elaine Puckett's testimony and written memorandum.

¶35. Defendants argue that one of Dr. Blake's nurses, Elaine Puckett, should have been allowed to testify to the substance of the aforementioned phone conversation with Ann Maddox and/or her written memo of the conversation made at or near the time of the phone call should have been admitted into evidence. Portions of Elaine Puckett's memorandum concerning the phone call, on August 7, 1998, include the following:

19

I answered a telephone call at about 10:15, and the lady asked to speak to Dr. Blake. I told her he was talking on another phone call and asked if she would like to leave a message. She said she had called yesterday and he wasn't in and she called back today to try to reach him. She said this is personal and I need to talk to him. 'This is about legal stuff.' I asked her to leave her name and telephone number and I would ask him to return her call. She said this is about a lawsuit and she didn't want her name in it. 'I think Dr. Blake needs to know what is happening.'

\* \* \*

'This is my son-in-law and he is suing Dr. Blake. Dr. Blake needs to know this before he gives his deposition.'

\* \* \*

'This is just not right. He is not taking care of his leg and did not before this. They are blaming Dr. Blake and he never took care of his leg.'

\* \* \*

'He is seeing a psychiatrist and they are saying this is because he is upset because of what happened to his leg but he was having problems before all this and seeing a psychiatrist.'

\* \* \*

'This is my daughter and what they are doing isn't right. Dr. Blake needs to know this. I have two grandchildren and if my daughter knew I was calling they would get mad at me.'

\* \* \*

'my husband and I have talked this over and don't think it is right for them to blame Dr. Blake.'

\* \* \*

'My son-in-law never took care of his foot. He is saying now that he wishes they would take it off up higher, but I told him that that is the last thing he should be wishing for.'

The trial court erred in excluding this testimony.

¶36. Furthermore, because the trial court excluded Maddox's testimony and written deposition, she then became an unavailable witness as described in Miss. R. Evid. 804. According to Rule 804(4), unavailability includes situations where the witness is unable to testify due to then existing physical or mental infirmity. Defendants argue that this hearsay evidence should be admitted under Mississippi Rule of Evidence 804(b)(5) as having circumstantial guarantees of trustworthiness.

20

¶37.   Mississippi Rule of Evidence 804(b)(5) reads in pertinent part:

(b) **Hearsay Exceptions**.  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

*** 

(5) *Other Exceptions*.   A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purpose of these rules and the interests of justice will be best served by admission of the statement into evidence. . . .

This Court finds that the conditions for admissibility under Rule 804 were satisfied with respect to Maddox's statements to Puckett.   Maddox's statements made to Puckett were admissible only if Dr. Blake could show (1) necessity for the evidence, and (2) adequate indicia of reliability.  *Jones v. Hatchett,*  504 So. 2d 198, 202 (Miss. 1987).   The statement was offered because Maddox raised questions regarding the legitimacy of the plaintiff's claims and had information regarding Clein's physical and mental state before and after the surgery performed by Dr. Blake.   All other avenues to elicit testimony from Maddox had been denied or excluded, and this was the only probative evidence of the information known by Maddox about Clein's injuries and about the legitimacy of his claims.   From the information obtained in Maddox's written deposition, there is no dispute that Maddox called Dr. Blake's office.  What Maddox allegedly failed to remember was the reason for the call and most of what she related.    Puckett's testimony would have provided the jury with probative information concerning this phone call.   This Court finds that Maddox's statements made to Puckett had

21

circumstantial guarantees of trustworthiness, and Puckett should have been allowed to testify as to the content of their conversation.

¶38. Additionally, Rule 613(b) of the Mississippi Rules of Evidence provides for the admissibility of prior statements of witnesses. The rule reads as follows: "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require." If Ann Maddox had testified live and subsequently agreed to the contents of Puckett's memo, then this rule would not come into play. However, if her live testimony contradicted the contents of the memo, then Elaine Puckett's testimony would have been admissible. Had Maddox's written deposition been introduced into evidence, then Rule 613 would also apply to Elaine Puckett's testimony, as Maddox had admitted to making the call but denied remembering why.

### III. Did the trial court err in preventing the words "curse" and "witchcraft" from being used at trial?

¶39. Prior to the surgery, and during the subsequent course of Clein's treatment, there are entries in his medical records which were introduced into evidence by agreement. Clein stated that he believed his dead mother, who practiced witchcraft, had placed a curse on him, which resulted in his amputation and condition. At trial, the judge ruled that the use of the words "curse" or "witchcraft" could not be used or referred to because of the alleged prejudicial effect the words might have upon the jury.

¶40. The plaintiff "opened the door" to this inquiry by offering into evidence his medical records, without redacting the records. There are numerous references to Clein's belief in a

22

curse within the medical records. Evidence, even if otherwise inadmissible, can be properly presented where a party has "opened the door." *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss. 1988). In this case, a significant component of plaintiff's claims are related to emotional distress and mental anguish, i.e. psychological or psychic injuries. As such the defense was denied an opportunity to legitimately explore the plaintiff's own statements regarding the origin and/or source, cause, and extent of his psychological injury, agitation, and disturbance.

¶41. The court does have discretion to exclude evidence if its probative value is outweighed by the danger of unfair prejudice. Miss. R. Evid. 403. However, this Court finds that the probative value of exploring the origin and/or source, cause, and extent of his emotional distress, mental anguish, and psychological injury, outweighed the danger of unfair prejudice. Clein alleged that Dr. Blake's procedure caused all three. The defense was thwarted in its attempt to establish by Clein's admissions in his medical records, that he suffered significant pre-existing mental and emotional issues totally unrelated to Dr. Blake's surgery, which was downplayed in his oral testimony. The plaintiff's prior statements are certainly probative regarding the origin and/or source, cause, and extent of his claimed mental and emotional problems, including pre and post surgery. This issue was both relevant and probative concerning causation and aggravation of the plaintiff's pre-existing mental condition, as will be discussed in Issue VIII. The trial court erred in prohibiting the defendant from developing facts through the cross-examination of the plaintiff and other witnesses, and in prohibiting documentary evidence, regarding the origin and/or source, cause and extent of his mental anguish and emotional distress, and finally erred in prohibiting the defense from arguing their theory to the jury with proper instructions.

23

## IV. Did the trial court err in allowing the testimony of orthopaedic surgeon, Dr. Hans-Jorg Trnka?

¶42. Unless an abuse of discretion is evident, a trial judge's determination on the qualification of an expert will not be disturbed on appeal. *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So. 2d 1346, 1357 (Miss. 1990).

¶43. Dr. Blake and JBJC argue that Miss. Code Ann. § 11-1-61 (Rev. 2002) controls with respect to who may qualify as a witness in a medical malpractice action. According to Miss. Code Ann. § 11-1-61:

> In any action for injury or death against a physician, whether in contract or in tort, arising out of the provision of or failure to provide health care services, a person may qualify as an expert witness on the issue of the appropriate medical standard of care if the witness is licensed in this state, or some other state, as a doctor of medicine.

Defendants argue that §11-1-61 precludes expert medical testimony by a physician not licensed within the United States. We disagree. This statute is one of inclusion rather than exclusion. Just because the statute reads that a person *may* qualify as an expert if licensed in this or another state, does not mean that one *may only* qualify as an expert if licensed in the United States. We find that this evidentiary statute does not conflict with the Mississippi Rules of Evidence, which govern evidentiary matters, including the qualification of expert witnesses.

¶44. The Mississippi Rules of Evidence govern who may qualify to testify as an expert. Mississippi Rule of Evidence 702, states in pertinent part, that "a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise. . . ." After examining these factors, this Court concludes that Dr. Trnka

24

was not qualified to testify as to the standard of care in August of 1995 involved in the case sub judice and the judge abused her discretion when allowing him to testify. However, this holding does not disqualify all doctors who are licensed and practice outside the United States. The decision should be on a case-by-case basis.

¶45. Although Dr. Trnka stated that he was familiar with the standard of care in the U.S. in 1995, the trial testimony reveals that in August of 1995, he was still in his residency in Austria and had not completed his own orthopedic training. Furthermore, he did not become a practicing orthopedic surgeon until after Dr. Blake had performed the surgery on Clein. Therefore, he testified about a standard of care in the U.S. at a time when he was not a licensed orthopedic surgeon in either Austria or the U.S.

¶46. Dr. Trnka completed all of his medical school training in Austria. He did not attend medical school in the United States. He had not taught in the United States. The only medical articles or treatises he claimed authorship of are unrelated. He has never been qualified as an expert in an American court. Significantly, the only records he reviewed to form an opinion were those of Dr. Blake. He is not licensed in the U.S. or any state in the U.S. Furthermore, he is not board certified by any medical board within the U.S. and has never practiced medicine anywhere in the U.S. His only experience in the U.S. was obtained by an observership in 1990 at John Hopkins on knee arthroplasties, which is not an issue in this case, and a Foot and Ankle traveling observership.

¶47. Dr. Trnka's knowledge, skill, experience, training and education were insufficient to qualify him to testify as an expert medical witness regarding the standard of care for a period

of time which preceded his acquisition of the knowledge, skill, and experience necessary to qualify him. Therefore, it was an abuse of discretion to allow Dr. Trnka to testify.

**V.      Did the trial court err in allowing into evidence photographs of the amputation?**

¶48.    A decision of a trial judge to admit photographs into evidence will not be disturbed absent a showing of an abuse of discretion. *Morris v. State*, 777 So. 2d 16, 27 (Miss. 2000). "A photograph, even if gruesome, grisly, unpleasant, or even inflammatory, may still be admissible if it has probative value and its introduction into evidence serves a meaningful evidentiary purpose." *Minor v. State*  831 So.2d 1116, 1120 (Miss. 2002) (quoting *Noe v. State*, 616 So.2d 298, 303 (Miss. 1993)).    "[P]hotographs which are gruesome or inflammatory and lack an evidentiary purpose are always inadmissible as evidence." *McFee v. State*, 511 So. 2d 130, 134 (Miss. 1987).

¶49.    This Court finds that the photographs of the amputation were exhibited for no meaningful evidentiary purpose.   The pictures in question (an original and one enlarged blurry copy) are of an unidentifiable, bloody, severed body part. In *Minor v. State*, 831 So. 2d 1116, 1120 (Miss. 2002), quoting *Noe*, 616 So. 2d at 303, this Court held that the use of photographs depicting body parts upon which a "medical technician . . . has used the tools of his trade to puncture, sever, dissect, and otherwise traumatize body parts is ill-advised."   In the case sub judice, Clein introduced into evidence poorly defined photos of a bloody, amputated limb, which served no probative evidentiary purpose other than to prejudice the defendant and to shock the jury.   Accordingly, it was error to introduce the photo.   Standing alone, this would

26

unlikely be reversible error, however, we caution litigants against using photographs which serve no probative evidentiary purpose.

### VI.     Did the trial court err in precluding the use of exhibits D-20, D-21 and D-24?

¶50.    Exhibits D-20, D-21 and D-24 contained a visual summary of the history of Clein's foot.   Two of the exhibits showed Clein's original injuries dating back to 1981, with one exhibit purportedly showing the history of the foot upon presentation to Dr. Blake.   Defendants argue that the exclusion of these exhibits was error.

¶51.    This Court finds no error in the exclusion of D-24 depicting Clein's original injuries with lacerations shown on the outside of the foot.   However, this Court does find error in the exclusion of D-21 and D-20.   D-21 contains an x-ray and a picture of Clein's bones as they were fractured in the motorcycle accident.   D-20 contains a depiction of the history of the foot upon presentation to Dr. Blake.   Dr. Blake should have been allowed to utilize the illustrations in his testimony.   D-24 is a depiction of what the foot looked like when presented to Dr. Blake, with two calluses clearly marked as "previous."   The judge excluded this illustration and stated that Dr. Blake could only testify as to what he saw at the time he treated Clein.   The judge opined that if Dr. Blake was allowed to testify to these illustrations, that the jury would be misled into thinking he had the information available to him at the time of treatment.   However, this could have been addressed in cross-examination.   "An expert's qualifications and the basis of his conclusions are open to cross-examination. The jury, as is their province, may reject the expert's testimony just as they might any other witness." *Hollingsworth v. Bovaird Supply Co.*,   465 So.2d 311, 314 (Miss. 1985).   Dr. Blake was qualified by education, skill and

experience and after reviewing plaintiff's personal medical records he could testify as to the history of Clein's foot problems from medical records and using the illustrations. This Court finds error in the exclusion of illustrations D-21 and D-20.

**VII.** **Did the trial court err in instructing the jury, *sua sponte*, with a jury instruction concerning the aggravation of plaintiff's pre-existing mental condition?**

¶52. "The Circuit Court enjoys considerable discretion regarding the form and substance of jury instructions." ***Splain v. Hines***, 609 So. 2d 1234, 1239 (Miss. 1992). "The trial judge may initiate and give appropriate written instructions in addition to the approved instructions submitted by the litigants if, in his discretion, he deems the ends of justice so require." ***Newell v. State***, 308 So. 2d 71, 78 (Miss. 1975).

¶53. The instruction given by the court concerning preexisting mental conditions was as follows:

> The Court instructs the jury that a Defendant who injures a plaintiff suffering from a pre-existing mental condition is liable for the entire damage for mental distress when no apportionment can be made between the pre-existing mental condition and the damage caused by the defendant - thus the defendant must take the plaintiff as he finds him.

> In other words, if you find by a preponderance of the evidence that Plaintiff, David Clein, is entitled to any damages for mental distress, you should compensate him for any aggravation of any existing mental or other defect (or activation of any such latent condition), resulting from such injury. If you find that there was such an aggravation, you should determine, if you can, what portion, if any, of the plaintiff's mental or other condition resulted from the aggravation and then make allowance in your verdict only for that portion of the aggravation. However, if you cannot make that determination, or apportion, or if it cannot be said that the condition would have existed apart from the injury, you should consider and make allowance in your verdict for the entire condition.

Defendants argue that this instruction was not warranted based upon the evidence adduced at trial; however, this Court disagrees. The jury heard that Clein was committed to a psychiatric hospital, experienced hallucinations and saw psychiatrists for anxiety and depression, prior to being treated by Dr. Blake.

¶54. "One who injures another suffering from a pre-existing condition is liable for the entire damage when no apportionment can be made between the pre-existing condition and the damage caused by the defendant — thus the defendant must take his victim as he finds her." *Brake v. Speed*, 605 So. 2d 28, 33 (Miss. 1992). This Court finds that this instruction was proper to inform the jury of how to allocate damages for Clein's claimed mental distress, but at the same time, highlights the trial court's errors in precluding the defendant from fully developing the source and/or cause, origin, and extent of plaintiff's mental and emotional history and excluding witnesses.

### VIII. Did the trial court err in refusing to instruct the jury regarding the non-taxability of damages?

¶55. Dr. Blake and JBJC argue that the jury should have been instructed that if they returned an award for damages, this award would not be taxable. Under § 104(a)(2) of the Internal Revenue Code of 1954, 26 U.S.C. § 104(a)(2) (1984), damages awarded as compensation for personal injury are not included in the recipient's gross income. Therefore, these awards are not subject to income taxation.

¶56. Defendants rely upon *Seaboard Sys. R.R., Inc. v. Cantrell,* 520 So. 2d 479 (Miss. 1987); however this reliance is misplaced. In *Cantrell*, the action was brought under the Federal Employee's Liability Act ("FELA"). Relying on the Supreme Court's decision in

29

*Norfolk & Western Ry. v. Liepelt*, 444 U.S. 490 (1980), this Court stated in *Cantrell* that, "[t]he question of whether it was error to refuse an instruction as to nontaxability of an award for economic loss in FELA cases is a matter governed by federal law, even though the action is brought in state courts." *Cantrell*, 520 So.2d at 484. In *Cantrell*, this Court found that the refusal of the trial court to grant an instruction as to the non-taxability of damages was reversible error. *Id.* at 484. However, the ruling in *Cantrell* was limited to cases arising under federal law. This Court in *Cantrell* did not expand this jury instruction requirement to state courts.

¶57. This Court rules in accordance with the majority of states that do not permit jury instructions as to the non-taxability of damages. "To inject the incidence of the ever changing tax scheme . . . into a jury damage trial would lead the jury into a hopeless quagmire of confusion and conjecture." *Paducah Area Pub. Library v. Terry*, 655 S.W.2d 19, 23 (Ky. Ct. App. 1983). The trial court did not err in refusing to instruct the jury as to the non-taxability of damages.

> **IX. Did the trial court err in prohibiting the jury from considering that Deborah Clein had failed to disclose a shoplifting conviction in an interrogatory response and in denying defendant's motion to compel?**
>
> **A. Failure to disclose shoplifting conviction**

¶58. Defendants argue that the fact that Deborah Clein, a former plaintiff who dismissed her case with prejudice, submitted false discovery responses, should have been disclosed to the jury. Deborah was not called as a witness at trial. Therefore, even if otherwise admissible, this

issue is moot. The failure of the plaintiff's wife to disclose a shoplifting conviction has no probative value in the determination of this case. This issue is without merit.

### B. Motion to Compel

¶59. Because Deborah's failure to disclose her shoplifting conviction was not admissible, this issue does not warrant further discussion and is meritless.

### X. Does missing page of an exhibit from the record on appeal warrant a new trial?

¶60. Defendants argue that because a page of exhibit P-18 is missing from the record on appeal, that they should be granted a new trial. "A party wishing to object to the admissibility of evidence must make clear that the evidence to which the objection was made can be identified in the record." *Kmart Corp v. Lee*, 789 So. 2d 103, 106 (Miss. Ct. App. 2001), citing *Cossitt v. Alfa Ins. Corp*., 726 So. 2d 132, 135 (Miss. 1998). This Court cannot hold trial judges in error because an exhibit has been misplaced. This Court finds that this argument is without merit.

### XI. Did the trial court err in denying defendants' motion for directed verdict and motion for judgment notwithstanding the verdict?

¶61. An appellate court reviews a trial court's grant or denial of a motion for directed verdict under the same standard of review that is employed when reviewing the denial of a judgment notwithstanding the verdict. *Shelton v. State*, 853 So. 2d 1171, 1186 (Miss. 2003). We review the ruling on the last occasion the challenge was made to the trial court; when the circuit court overruled the motion for JNOV. *Id.* This Court's standard in reviewing the denial of the JNOV is as follows:

This Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Ala. Great S. R.R. v. Lee*, 826 So. 2d 1232, 1235-36 (Miss. 2002).

¶62. Dr. Blake and JBJC argue that not one of plaintiff's medical experts "ever testified to a reasonable degree of medical probability or certainty that Plaintiff's amputation and other damages were proximately caused by the surgery performed by Dr. Blake." This Court has held that "[a] medical expert need not testify with absolute certainty." *Stratton v. Webb*, 513 So. 2d 587, 590 (Miss. 1987). In *Stratton*, the defendants argued that the plaintiff had not provided the appropriate medical expert testimony to satisfy causation requirements because the medical expert had testified that he could not positively state the cause of the plaintiff's medical condition. *Id.* at 589. However, the expert testified that the plaintiff had back problems following her accident and felt the injury was related to the accident. *Id.* at 590. In finding that there was sufficient causation evidence to sustain the verdict, this Court stated that the expert's "testimony, taken as a whole, sufficiently established a reasonable medical certainty that the accident caused the injuries." *Id.*

¶63. As a whole, although disputed, the testimony was sufficient for reasonable and fairminded jurors to conclude that (1) the procedure performed by Dr. Blake was a breach of the standard of care, (2) that Dr. Blake violated the standard of care by not adequately describing the risks when obtaining consent to perform the surgery, and (3) that the surgery

was a proximate or proximate contributing cause of Clein's amputation. Clein testified that his condition following the surgery was so painful that he ultimately concluded he would be better off by having his foot amputated. "Any witness is competent to testify who has evidentiary facts within his personal knowledge, gained through any of his senses. A nonprofessional witness may describe personal injuries. Physical pain, weakness, exhaustion and the like are matters one may testify about." *Id.* (quoting *Dennis v. Prisock*, 221 So. 2d 706, 710 (Miss. 1969)). Clein stated that the pain he experienced in his foot after the surgery was often times unbearable and because of this proceeded with the amputation.

¶64. Dr. Gottschalk testified that the deformity of Clein's foot was in part a result of the surgery performed by Dr. Blake. He also testified that the manner in which Dr. Blake performed the procedure, an osteomy at midshaft, was not within the standard of care. Dr. Frank Gottschalk recommended amputation because of the deformity of the foot and that the deformity was caused in part by the procedure Dr. Blake had performed.

¶65. Dr. Keith Donatto testified that Dr. Blake did not perform the multiple metatarsal osteotomy within the standard of care because "the osteomies were left to float," which caused malunions. Dr. Donatto also testified that the pain Clein was experiencing after the surgery was because of these malunions.

¶66. After a careful review of the record, we conclude that there was sufficient evidence to create a jury issue that the procedure performed by Dr. Blake and/or the lack of informed consent was a proximate contributing cause of Clein's amputation. The testimony of Drs. Gottschalk and Donatto, along with Clein's testimony was sufficient to submit the issue of

33

proximate cause to the jury. The trial court did not err in denying the JNOV motion. This issue is without merit.

### XII. Whether the trial court erred in refusing to grant a remittitur.

¶67. Because we reverse and remand for a new trial, this issue requires no discussion.

### CONCLUSION

¶68. A comprehensive review of the record reveals multiple and substantial errors by the trial court. While any of these errors standing alone might not require reversal, the cumulative effect of errors deprived the defendants of a fair trial. Therefore, the judgment of the trial court is reversed, and this case is remanded for a new trial consistent with this opinion.

¶69. **REVERSED AND REMANDED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND DICKINSON, JJ., CONCUR. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ , J., NOT PARTICIPATING.**